**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
CENTRAL DIVISION**

| | |
|---|---|
| ELANA AIELLO,<br><br>                    Plaintiff,<br><br>v.<br><br>EXPERIAN INFORMATION SOLUTIONS,<br>INC. EQUIFAX INFORMATION<br>SERVICES, LLC, TRANS UNION LLC, and<br>NELNET SERVICING, LLC.<br><br>                    Defendants. | Case No.:<br><br><br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Elana Aiello ("Plaintiff" or "Ms. Aiello"), by and through the undersigned counsel, brings this action on an individual basis, against Equifax Information Services, LLC ("Equifax"); Experian Information Solutions, Inc. ("Experian"); Trans Union LLC ("Trans Union"); (collectively, the "Credit Bureau Defendants"); and Nelnet Servicing, LLC ("Nelnet"); (all defendants collectively, "Defendants"), and states as follows:

## INTRODUCTION

1.      The computerization of our society has resulted in a revolutionary increase in the accumulation and processing of data concerning individual American consumers. Data technology, whether it is used by businesses, banks, the Internal Revenue Service or other institutions, allows information concerning individual consumers to flow instantaneously to requesting parties. Such timely information is intended to lead to faster and better decision-making by its recipients and, in theory, all of society should ultimately benefit from the resulting

convenience and efficiency.

2.      However, unfortunately this information has also become readily available for, and subject to, mishandling and misuse. Individual consumers can and do sustain substantial damage, both economically and emotionally, whenever inaccurate or fraudulent information is disseminated and/or obtained about them. In fact, the Credit Bureau Defendants acknowledge this potential for misuse and resulting damage every time they sell their respective credit monitoring services to a consumer.

3.      The ongoing technological advances in the area of data processing have resulted in a boon for the companies that accumulate and sell data concerning individuals' credit histories and other personal information. Such companies are commonly known as consumer reporting agencies ("CRAs").

4.      These CRAs sell information to readily paying subscribers (i.e., retailers, landlords, lenders, potential employers, and other similar interested parties), commonly called "consumer reports," concerning individuals who may be applying for retail credit, housing, employment, or a car or mortgage loan.

5.      Since 1970, when Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), federal law has required CRAs to implement and utilize reasonable procedures "to assure maximum possible accuracy" of the personal, private, and financial information that they compile and sell about individual consumers.

6.      One of the primary purposes in requiring CRAs to assure "maximum possible accuracy" of consumer information is to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

See 15 U.S.C. § 1681(a)(1).

7.    The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed.

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 cong. Rec. 36570 (1970)] (emphasis added).

8.    The FCRA also requires CRAs to conduct a reasonable reinvestigation to determine whether information disputed by consumers is inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which the CRA receives the notice of dispute from the consumer. This mandate exists to ensure that consumer disputes are handled in a timely manner and that inaccurate information contained within a consumer's credit report is corrected and/or deleted so as to not prevent said consumer from benefiting from his or her credit and obtaining new credit.

9.    In light of these important findings and purposes, Congress specifically noted "a need to insure that [CRAs] exercise their grave responsibilities with fairness, impartiality, and respect for the consumer's right to privacy." *See* 15 U. S. C. § 1681(a)(4).

10.    The FCRA also requires furnishers of information, a creditor or other third party that provides information about consumer to a CRA, upon notice, to conduct a reasonable reinvestigation of all disputes with regard to the completeness or accuracy of any information it

provides to the CRAs regarding a consumer and modify, delete, or permanently block any items of information found to be inaccurate, incomplete, or unverifiable after said reinvestigation is completed.

11.    Plaintiff's claims arise out of the Credit Bureau Defendants' blatantly inaccurate credit reporting, wherein the Credit Bureau Defendants reported to Plaintiff's potential creditors that Plaintiff been 90 days past-due on her student loans.

12.    Accordingly, Plaintiff brings claims against the Credit Bureau Defendants for failing to follow reasonable procedures to assure the maximum possible accuracy of Plaintiffs credit reports, in violation of the FCRA, 15 U.S.C. § 1681e(b), and failing to conduct a reasonable reinvestigation to determine whether information Plaintiff disputed was inaccurate and record the current status of the disputed information, or delete the disputed information from Plaintiffs credit file, in violation of the FCRA, 15 U.S.C. § 1681i.

13.    Plaintiff also brings a claim against Defendant Nelnet for failing to fully and properly reinvestigate Plaintiff's disputes and review all relevant information provided by Plaintiff and the Credit Bureau Defendants, in violation of the FCRA, 15 U.S.C. § 1681s-2(b)(1).

14.    As part of this action, Plaintiff seeks actual, statutory, and punitive damages, costs and attorneys' fees from Defendants for their willful and/or negligent violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*., as described herein.

## **PARTIES**

15.    Elana Aiello ("Plaintiff" or "Ms. Aiello") is a natural person residing in Auburn, Massachusetts and is a "consumer" as that term is defined in 15 U.S.C. § 1681a(c).

16.    Defendant Equifax Information Services, LLC. ("Defendant Equifax" or "Equifax") is a limited liability company with a principal place of business located at 1550

Peachtree Street, N.W., Atlanta, Georgia 30309, and is authorized to do business in the Commonwealth of Massachusetts, including within this District.

17.    Equifax is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

18.    Defendant Experian Information Solutions, Inc. ("Defendant Experian" or "Experian") is a corporation with a principal place of business located at 701 Experian Pkwy, Allen, Texas 75013, and is authorized to do business in the Commonwealth of Massachusetts, including within this District.

19.    Experian is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Experian is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

20.    Defendant Trans Union LLC ("Defendant Trans Union" or "Trans Union") is a limited liability company with a principal place of business located at 2 Baldwin Place, Chester, PA 19022, and is authorized to do business in the Commonwealth of Massachusetts, including within this District.

21.    Trans Union is a "consumer reporting agency" as defined in 15 U.S.C. § 1681a(f). Trans Union is regularly engaged in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d) to third parties.

22.    Defendant Nelnet Servicing, Inc. ("Nelnet") is a limited liability company with its

headquarters in Lincoln, Nebraska and is authorized to do business in the Commonwealth of Massachusetts, including within this District.

23.     Nelnet is a student loan servicer and "furnisher" of consumer information, as defined in 15 U.S.C. § 1681s-2(b).

**JURISDICTION AND VENUE**

24.     This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p, which allows claims under the FCRA to be brought in any appropriate court of competent jurisdiction.

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

**FACTS**

**Summary of the Fair Credit Reporting Act**

26.     The FCRA governs the conduct of consumer reporting agencies in an effort to preserve the integrity of the consumer banking system and to protect the rights of consumers to fairness and accuracy in the reporting of their credit information.

27.     The FCRA was designed to protect consumers from the harmful effects of inaccurate information reported in consumer reports (commonly referred to as "credit reports"). Thus, Congress enshrined the principles of "fair and accurate credit reporting" and the "need to ensure that consumer reporting agencies exercise their grave responsibilities with fairness" in the very first provision of the FCRA. *See* 15 U.S.C. § 1681(a).

28.     Specifically, the statute was intended to ensure that "consumer reporting agencies adopt reasonable procedures for meeting the needs of commerce for consumer credit, personnel, insurance, and other information in a manner which is fair and equitable to the consumer, with

regard to the confidentiality, accuracy, relevancy, and proper utilization of such information. *See* 15 U.S.C. § 1681(b).

29.     To that end, the FCRA imposes the following twin duties on consumer reporting agencies: (i) consumer reporting agencies must devise and implement reasonable procedures to ensure the "maximum possible accuracy" of information contained in consumer reports (15 U.S.C. § 1681e(b)); and (ii) consumer reporting agencies must reinvestigate the facts and circumstances surrounding a consumer's dispute and timely correct any inaccuracies (15 U.S.C. § 1681i).

30.     The FCRA provides consumers with a private right of action against consumer reporting agencies that willfully or negligently fail to comply with their statutory obligations under the FCRA.

**Factual Background**

31.     The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting.  Inaccurate consumer reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continual functioning of the banking system.

32.     The Credit Bureau Defendants sell millions of consumer reports (often called "credit reports" or "reports") per day, and also sell credit scores.

33.     Pursuant to 15 U.S.C. § 1681e(b), consumer reporting agencies, like the Credit Bureau Defendants, are required "to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

34.     Pursuant to 15 U.S.C. §§ 1681b and 1681e(a), consumer reporting agencies, like the Credit Bureau Defendants, must maintain reasonable procedures to assure that consumer reports are sold only for legitimate "permissible purposes."

35.     The Credit Bureau Defendants' consumer reports generally contain the following information:

(a)    Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers;

(b)    Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status;

(c)    Public Record Information: this section typically includes public record information, such as bankruptcy filings; and,

(d)    Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

36.     The Credit Bureau Defendants obtain consumer information from various sources. Some consumer information is sent directly to the CRA by furnishers.

37.     The majority of institutions that offer financial services (e.g., banks, creditors, and lenders) rely upon consumer reports from CRAs (like the Credit Bureau Defendants) to make lending decisions.

38.     Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history,

and date of delinquencies contained in the Credit Bureau Defendants' consumer reports.

39.     The information the Credit Bureau Defendants include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

40.     FICO Scores are calculated using information contained in the Credit Bureau Defendants' consumer reports.

41.     The Credit Bureau Defendants know that FICO and other third-party algorithms (as well as the algorithms owned by the Credit Bureau Defendants) use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

42.     The Credit Bureau Defendants know that lenders also consider a consumer's debt-to-income ratio (DTI) before deciding to extend credit or approve financing terms.

43.     DTI compares the total amount a consumer owes to the total amount a consumer earns.

44.     The higher the amount of reported debt that a consumer has, or appears to have, or is rather *reported* to have, the less favorable the consumer's DTI will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms. Rather, if offered credit at all, consumers will be offered less credit and at higher interest rates.

45.     The Credit Bureau Defendants routinely report inaccurate and materially misleading information about consumers like Plaintiff, without verifying or updating it as required by Section 1681e(b) of the FCRA.

46.     The Credit Bureau Defendants fail to employ reasonable procedures to assure the maximum possible accuracy of the information that they report about consumers, including but not limited to, account balances, account statuses, payment histories, and payment statuses.

9

47.    Consumers have filed thousands of lawsuits and FTC and Consumer Financial Protection Bureau Complaints against the Credit Bureau Defendants for their inaccurate credit reporting.

48.    Thus, the Credit Bureau Defendants are on continued notice of their respective inadequate reporting procedures.  Specifically, the Credit Bureau Defendants are on notice that their inadequate procedures regularly result in the reporting of inaccurate balances, account statuses, payment histories, and payment statuses.

49.    The Credit Bureau Defendants have received and documented many disputes from consumers complaining that Credit Bureau Defendants reported inaccurate information about them.

### Plaintiff's Student Loan History and Perfect Payment Record

50.    Plaintiff is a responsible borrower who has maintained an excellent credit history throughout her adult life.

51.    In or around 2011, Plaintiff obtained federal student loans to finance her education, which were initially serviced by various federal student loan servicers.

52.    For over a decade, Plaintiff maintained a perfect payment history on all of her student loan obligations, consistently making timely monthly payments without any late payments or defaults.

53.    As of January 2023, Plaintiff's student loans were being serviced by Great Lakes Higher Education Corporation ("Great Lakes").

54.    Plaintiff had never missed a payment or been reported as delinquent on any of her student loan accounts serviced by Great Lakes.

55.    Great Lakes had accurate contact information for Plaintiff, including her correct

address in Thompson, Connecticut, her correct email address, and her correct phone number.

56.    As of February 2025, Plaintiff maintained an exceptional FICO credit score of 793, reflecting her excellent payment history and responsible credit management.

### The Great Lakes to Nelnet Transfer and Data Transmission Error

57.    On or about January 24, 2023, Great Lakes sent Plaintiff an email notification informing her that her student loan servicing was being transferred to Defendant Nelnet.

58.    The transfer notification from Great Lakes stated "No action needed from you at this time" and assured Plaintiff that the transition would be seamless.

59.    Plaintiff reasonably relied on Great Lakes' representation that no action was required on her part during the transfer process.

60.    Upon information and belief, during the transfer of Plaintiff's student loan accounts from Great Lakes to Nelnet, a data transmission error occurred that resulted in incorrect contact information being entered into Nelnet's systems.Specifically, Nelnet's records contained  an address in Centennial, Colorado with which Plaintiff has never been associated, a telephone number that has never belonged to or been used by Plaintiff, and an email address that Plaintiff does not recognized. the following incorrect contact information for Plaintiff: a. a wrong address in Centennial, Colorado,  b. an email address that Plaintiff has never used, and c. a phone number that did not belong to Plaintiff.

61.    Upon information and belief, the incorrect contact information in Nelnet's system was the direct result of Nelnet's data processing error and was not caused by any action or inaction on Plaintiff's part.

### The COVID-19 Payment Pause and Resumption

62.    Following the transfer to Nelnet, Plaintiff's student loans remained in the federal

COVID-19 payment pause that had been in effect since March 2020.

63.    During the payment pause period, no payments were required on federal student loans, and borrowers were not reported as delinquent for non-payment.

64.    The COVID-19 payment pause officially ended in October 2023, requiring borrowers to resume making monthly payments on their student loans.

65.    Because Nelnet had incorrect contact information for Plaintiff, she did not receive any notices regarding the end of the payment pause or the resumption of required monthly payments.

66.    Plaintiff did not receive any payment notices, billing statements, or other communications from Nelnet regarding her student loan obligations due to the incorrect contact information in their system.

### Credit Damage and Inaccurate Reporting

67.    Beginning in or around November 2024, Defendant Nelnet began reporting to the Credit Bureau Defendants that Plaintiff was delinquent on her student loan payments.

68.    Upon information and belief, Nelnet reported to the Credit Bureau Defendants that Plaintiff had failed to make timely payments on five (5) separate student loan accounts.

69.    The Credit Bureau Defendants accepted and reported this inaccurate information in Plaintiff's credit files and consumer reports.

70.    As a result of Nelnet's inaccurate reporting, Plaintiff's credit reports began showing multiple student loan accounts with negative payment histories, including accounts that were reported as being 90-days past-due.

71.    The negative reporting was entirely inaccurate because Plaintiff had never received any payment notices or communications from Nelnet due to its data transmission error.

### Discovery of the Problem and Immediate Response

72.    On or about February 10, 2025, Nelnet contacted Plaintiff's mother regarding Plaintiff's allegedly delinquent student loan accounts.

73.    Plaintiff's mother immediately contacted Plaintiff to inform her of Nelnet's call, which was the first time Plaintiff became aware that there were any issues with her student loan accounts.

74.    Upon learning of the situation, Plaintiff was shocked, flabbergasted, and devastated that her previously perfect credit history had been damaged through no fault of her own.

75.    Immediately upon discovering the problem, Plaintiff took swift action to remedy the situation.

76.    On or about February 19, 2025, Plaintiff made a payment of $1,149.75 to bring all of her student loan accounts current with Nelnet.

77.    Plaintiff continued to make all required payments to Nelnet following her discovery of the contact information error.

78.    Despite Plaintiff's immediate remedial action and resumption of payments, the negative information remained on her credit reports, continuing to damage her creditworthiness.

### Documented Credit Damage

79.    As documented by her February 11, 2025 Experian credit report, Plaintiff maintained excellent credit with a FICO score of 793 and zero derogatory accounts prior to Nelnet's inaccurate reporting.

80.    Plaintiff's February 2025 credit report specifically stated "NO MISSED PAYMENTS REPORTED" and showed that all of her student loan accounts were being "PAID AS AGREED."

81.     By April 8, 2025, Plaintiff's Experian credit report showed five (5) student loan accounts with Nelnet that were reported as 90-days past-due, dramatically altering her credit profile.

82.     Plaintiff's Equifax credit report dated February 21, 2025, similarly showed five (5) student loan accounts with past due amounts totaling $687.

83.     The dramatic change in Plaintiff's credit reports between February and April 2025 demonstrates the severe impact of Nelnet's inaccurate data transmission and reporting.

84.     The negative marks are scheduled to remain on Plaintiff's credit reports until at least September 2031, representing over six years of ongoing credit damage.

**Plaintiff's First Dispute to the Credit Bureau Defendants Regarding the Inaccurate Credit Reporting**

85.     On or about April 21, 2025, extremely shocked, surprised, and embarrassed at the Credit Bureau Defendants' inaccurate reporting, Plaintiff disputed the 90-day late notation associated with her student loans with Defendant Nelnet with each of the Credit Bureau Defendants.

86.     Plaintiff explained that any notation that she was 90-days late in January of 2025 in relation to her student loans with Defendant Nelnet was inaccurate because Nelnet had the wrong contact information for her and never advised her that payments were due. Plaintiff also included a screenshot from her Nelnet online account showing that it had the wrong address for her on file.

87.     Plaintiff requested that Equifax, Experian, and Trans Union reinvestigate the disputed information, correct the reporting, and for each to send her a corrected copy of her credit report.

**Defendant Equifax's Unreasonable Dispute Reinvestigation**

88.     On or about May 13, 2025, Plaintiff received a letter from Equifax requesting additional proof of identity in order to process her dispute.

89.     On or about June 11, 2025, Plaintiff mailed additional proof of identity to Equifax as requested.

90.     On or about June 19, 2025, Plaintiff received a letter from Equifax stating that her documents were illegible and that it was not going to process her dispute.

91.     Upon information and belief, Defendant Equifax failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

92.     Upon information and belief, Defendant Equifax failed to conduct a reasonable reinvestigation of Plaintiff's April 21, 2025 dispute.

93.     Thereafter, Defendant Equifax failed to correct or delete the 90-day late notation appearing in Plaintiff's credit file.

94.     Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered April 21, 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Experian's Unreasonable Dispute Reinvestigation**

95.     Upon information and belief, Experian sent Defendant Nelnet an automated credit dispute verification ("ACDV") pursuant to Plaintiff's April 21, 2025 dispute to Experian.

96.     Upon information and belief, Defendant Experian failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

97.     Upon information and belief, Defendant Experian failed to conduct a reasonable

reinvestigation of Plaintiff's April 21, 2025 dispute.

98.    Thereafter, Defendant Experian failed to correct or delete the 90-day late notation appearing in Plaintiff's credit file.

99.    Experian failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered April 21, 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**Defendant Trans Union's Unreasonable Dispute Reinvestigation**

100.    Upon information and belief, Trans Union sent Defendant Nelnet an automated credit dispute verification ("ACDV") pursuant to Plaintiff's April 21, 2025 dispute to Trans Union.

101.    Upon information and belief, Defendant Trans Union failed to adequately review all of the information provided to it by Plaintiff in support of Plaintiff's dispute.

102.    Upon information and belief, Defendant Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's April 21, 2025 dispute.

103.    Thereafter, Defendant Trans Union failed to correct or delete the 90-day late notation appearing in Plaintiff's credit file.

104.    Trans Union failed to conduct a reasonable reinvestigation of Plaintiff's dispute tendered April 21, 2025, or any reinvestigation whatsoever, to determine whether the disputed information is inaccurate and record the current status of the disputed information, in violation of 15 U.S.C. § 1681i(a)(1)(A).

**The Credit Bureau Defendants' Method for Considering Consumer Credit Report Disputes**

105.    The credit industry has constructed a method of numeric-alpha codes for considering consumer credit report disputes. See 15 U.S.C. § 1681i(a)(5)(D).

106.    The credit bureaus, Equifax, Experian, Trans Union, and Innovis, have thus created the Online Solution for Complete and Accurate Reporting, or e-OSCAR, as the credit industries' standard of performance. e-OSCAR allows the credit bureaus to create and data furnishers to respond to disputes initiated by consumers by routing credit reporting agency-created prompts for automated consumer dispute verifications to the appropriate data furnishers. e-OSCAR utilizes a numeric-alpha language specific to the credit reporting industry.

107.    That lexicon or unique language is commonly referred to in the credit reporting industry as "Metro 2 Format" or "Metro 2."

108.    It is also known industry wide as the CDIA's "Credit Reporting Resource Guide."

109.    Metro 2 is driven by numeric codes that translate into specific alpha representations about consumers' creditworthiness and character that will ultimately appear on credit reports issued to third parties who make credit, insurance, rental, and employment decisions regarding consumers.

110.    Metro 2 codes are used on an industry wide form known within the credit industry as an Automated Consumer Dispute Verification ("ACDV") electronic form.

111.    The ACDVs have many fields in their body for use in effecting thorough and complete communications between data furnishers and the credit reporting agencies.

112.    These ACDV "fields" have various titles for the many substantive areas into which the Metro 2 codes can be entered.

113.    Upon receiving a dispute from a consumer, the credit bureaus have an automated system that prepares ACDVs that are sent to each of the data furnishers that are reporting the credit accounts disputed by a consumer.

114.    The data furnishers, like Defendant Nelnet, then have an obligation under the

FCRA to conduct a reasonable reinvestigation with respect to the disputed credit account and review all relevant information provided by the consumer with the dispute to determine whether the disputed credit account information is accurate and/or belongs to the disputing consumer. See 15 U.S.C. § 1681s-2(b).

115.    Once the data furnisher completes its reinvestigation, it will code the ACDV accordingly, representing either that the disputed account was verified as accurate and belonging to the disputing consumer, updating information related to the account, or deleting the account entirely, and return the ACDV to the respective credit bureau(s) via e-OSCAR.

**Defendant Nelnet's Unreasonable Dispute Reinvestigation**

116.    Upon information and belief, in or about May 2025, Defendant Nelnet received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

117.    Upon information and belief, Defendant Nelnet failed to review all relevant information provided by Defendant Experian's regarding Plaintiff's dispute tendered on or about April 21, 2025.

118.    Upon information and belief, Defendant Nelnet verified the disputed information as accurate to Defendant Experian in or about May 2025.

119.    Upon information and belief, in or about May 2025, Defendant Nelnet received Defendant Experian's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

120.    Upon information and belief, Defendant Nelnet failed to review all relevant information provided by Defendant Experian regarding Plaintiff's dispute tendered on or about April 21, 2025.

121.    Upon information and belief, in or about May 2025, Defendant Nelnet verified the disputed information as accurate to Defendant Experian.

122.    Upon information and belief, in or about May 2025, Defendant Nelnet received Defendant Trans Union's ACDV and failed to conduct a reasonable investigation with respect to the information disputed by Plaintiff.

123.    Upon information and belief, Defendant Nelnet failed to review all relevant information provided by Defendant Trans Union regarding Plaintiff's dispute tendered on or about April 21, 2025.

124.    Upon information and belief, in or about May 2025, Defendant Nelnet verified the disputed information as accurate to Defendant Trans Union.

125.    Defendant Nelnet violated 15 U.S.C. § 1681s-2b by failing to conduct a reasonable investigation with respect to the disputed information, failing to review all relevant information available to it, and failing to modify, delete, or permanently block the disputed information that was inaccurate, incomplete or unverifiable.

126.    Plaintiff reasonably believes that Defendant Nelnet continues to furnish data to the national credit bureaus inaccurately suggesting that Plaintiff was 90-days late on a payment obligation owed to Defendant Nelnet in January of 2025.

127.    Plaintiff reasonably believes that the Credit Bureau Defendants continued to publish that Plaintiff was 90-days late on a payment obligation owed to Defendant Nelnet in January of 2025.

128.    As a result of the inaccurate 90-days late notation, Defendants have made it practically impossible for Plaintiff to continue to obtain credit.

129.    At all times pertinent hereto, Defendants were acting by and through their agents,

servants, and/or employees who were acting within the course and scope of their agency or employment, and under the direct supervision and control of the Defendants herein.

130.    At all times pertinent hereto, the conduct of Defendants, as well as that of their respective agents, servants, and/or employees, was intentional, willful, reckless, grossly negligent and in utter disregard for federal law and the rights of Plaintiff herein.

131.    As a standard practice, the Credit Bureau Defendants do not conduct independent investigations in response to consumer disputes.  Instead, they merely parrot the response of the credit furnisher despite numerous court decisions admonishing this practice.  *See Cushman v. Trans Union Corp.*, 115 F.3d 220, 225 (3d Cir. 1997) (The 'grave responsibilit[y]' imposed by § 1681i(a) must consist of something more than merely parroting information received from other sources.  Therefore, a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute."); *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1230-31 (D.N.M. 2006) (noting that credit reporting agencies may not rely on automated procedures that make only superficial inquiries once the consumer has notified it that information is disputed); *Gorman v. Experian Info. Sols., Inc.*, 2008 WL 4934047, at *6 (S.D.N.Y. Nov. 19, 2008).

132.    The Credit Bureau Defendants are aware of the shortcomings of their procedures and intentionally choose not to comply with the FCRA to lower their costs.  Accordingly, the Credit Bureau Defendants' violations of the FCRA are willful.

133.    As a result of Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate

credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

## CLAIMS FOR RELIEF
### COUNT I
### 15 U.S.C. § 1681e(b)
### Failure to Follow Reasonable Procedures to Assure Maximum Possible Accuracy
### (First Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

134.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

135.    The FCRA imposes a duty on consumer reporting agencies to devise and implement procedures to ensure the "maximum possible accuracy" of consumer reports, as follows:

> Whenever a consumer reporting agency prepares a consumer report, it shall follow reasonable procedures to assure ***maximum possible accuracy*** of the information concerning the individual about whom the report relates.

15 U.S.C. §1681e(b) (emphasis added).

136.    On numerous occasions, Defendants Equifax, Experian, and Trans Union prepared patently false consumer reports concerning Plaintiff.

137.    Defendants Equifax, Experian, and Trans Union readily sold such false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

138.    Defendant Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

139.    Defendant Experian violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

140.    Defendant Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning Plaintiff.

141.    As a result of Defendants' Equifax, Experian, and Trans Union conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

142.    Defendants Equifax, Experian, and Trans Union's conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

143.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## COUNT II
### 15 U.S.C. § 1681i
### Failure to Perform a Reasonable Reinvestigation
### (Second Claim for Relief Against Defendants Equifax, Experian, and Trans Union)

144.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

145.    The FCRA mandates that a CRA conducts an investigation of the accuracy of information "[I]f the completeness or accuracy of any item of information contained in a consumer's file" is disputed by the consumer.  *See* 15 U.S.C. § 1681i(a)(1).  The Act imposed a

30-day time limit for the completion of such an investigation. *Id*.

146.    The FCRA provides that if a CRA conducts an investigation of disputed information and confirms that the information is in fact inaccurate or is unable to verify the accuracy of the disputed information, the CRA is required to delete that item of information from the consumer's file. *See* 15 U.S.C. § 1681i(a)(5)(A).

147.    On at least one occasion during the past two years, Plaintiff disputed the inaccurate information with Equifax, Experian, and Trans Union and requested that they correct and/or delete a specific item in her credit file that is patently inaccurate, misleading, and highly damaging to her, namely, the 90-days late notation reported about her payment history in January 2025, in relation to Plaintiff's student loans with Defendant Nelnet.

148.    In response to Plaintiff's dispute, Equifax failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

149.    In response to Plaintiff's dispute, Experian failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

150.    In response to Plaintiff's dispute, Trans Union failed to conduct a reinvestigation, or such investigation was so shoddy as to allow patently false, logically inconsistent, and damaging information to remain in Plaintiff's credit file.

151.    The Credit Bureau Defendants violated 15 U.S.C. § 1681i by failing to conduct a reasonable reinvestigation to determine whether the disputed information was inaccurate and record the current status of the disputed information, or delete the disputed information, before the end of the 30-day period beginning on the date on which they received the notices of dispute from

Plaintiff; and by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file.

152.    As a result of the Credit Bureau Defendants' conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

153.    The Credit Bureau Defendants' conduct, actions, and inactions were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

154.    Plaintiff is entitled to recover attorneys' fees and costs from Defendants Equifax, Experian, and Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

**COUNT III**
**15 U.S.C. § 1681s-2(b)**
**Failure to Conduct an Investigation of the Disputed Information and Review all Relevant Information Provided by the Consumer**
**(Only Claim for Relief Against Defendant Nelnet)**

155.    Plaintiff re-alleges and incorporates by reference the allegations set forth in preceding paragraphs as if fully stated herein.

156.    Defendant Nelnet furnished the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

157.    Defendant Nelnet violated 15 U.S.C. § 1681s-2(b) by failing to investigate

Plaintiff's dispute, or otherwise by failing to fully and properly investigate Plaintiff's dispute(s), including but not limited to failing to review all relevant information regarding the same; by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union; and, by failing to cease furnishing inaccurate information relating to Plaintiff to the national credit bureaus, including but not limited to Equifax, Experian, and Trans Union.

158.    As a result of Defendant Nelnet's conduct, action, and inaction, Plaintiff suffered damage by loss of credit; loss of ability to purchase and benefit from her good credit rating; detriment to her credit rating; the expenditure of time and money disputing and trying to correct the inaccurate credit reporting; the expenditure of labor and effort disputing and trying to correct the inaccurate credit reporting; and emotional distress including the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

159.    Defendant Nelnet's conduct, action, and inaction were willful, rendering them liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  Alternatively, they were negligent, entitling Plaintiff to recover under 15 U.S.C. § 1681o.

160.    Plaintiff is entitled to recover attorneys' fees and costs from Defendant Nelnet in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

i.    Determining that Defendants negligently and/or willfully violated the FCRA;

ii.    Awarding Plaintiff actual, statutory, and punitive damages as provided by the FCRA;

iii.    Awarding Plaintiff reasonable attorneys' fees and costs as provided by the FCRA; and,

iv.    Granting further relief, in law or equity, as this Court may deem appropriate and just.

**DEMAND FOR JURY TRIAL**

Plaintiff is entitled to and hereby demands a trial by jury on all issues so triable.


Dated: August 26, 2025,

By: *Nicola S. Yousif*
 Nicola S. Yousif, MA No. 679545
SHIELD LAW, LLC
157 Belmont Street
Brockton, MA 02301
T: (508) 588-7300
E: nick@shieldlaw.com

*Attorneys for Plaintiff,*
*Elana Aiello*

26

## CERTIFICATE OF SERVICE

I hereby certify that on August 26, 2025, I electronically filed the foregoing with the Clerk of the Court using the ECF system, which will send notice of such filing to all attorneys of record in this matter. Since none of the attorneys of record are non-ECF participants, hard copies of the foregoing have not been provided via personal delivery or by postal mail.

**CONSUMER JUSTICE LAW FIRM PLC**
By: */s/Moises Masedman*